Case number 23-3167. Patra Noumoff v. Checkers Drive-In Restaurants, Inc. All arguments not to exceed 15 minutes per side. Mr. Michael J. O'Hara for the appellate. Good morning, Your Honors. Michael O'Hara for Patra Noumoff. Your Honors, if it pleases the Court, the district court below incorrectly applied the employer's honest belief defense in disposing of all plaintiff's pretext arguments and ultimately dismissing her discrimination claims and her claims of retaliation in one fell swoop. In doing so, it violated this Court's holding that the honest belief rule only applies to a pretext argument that is directed at falsity of the articulated reasons, not to arguments that apply specifically to the, in our case, the argument that the articulated reasons were insufficient to motivate the employer's actions or did not actually motivate those actions. The defendants essentially in their brief can see that point. So what I'd like to do is focus on the other major error that we've noticed. Well, before we jump off of that, I mean, we can affirm on any basis supported by the record. So why don't you tell us how the evidence that you presented to the district court creates a genuine issue of fact as to any of those three grounds on which you can go to trial on the question of pretext. All right, so let me jump ahead specifically to that. And what I'd like to do then is go through each of those. Yeah, that's what I'm asking. So the first one the Court will remember was a written warning issued by Almir Vologic on April 17, 2018 to Ms. Neumoff, essentially doing a formal written sanction against her for an email and a phone call that preceded that warning the day before. So this would go to the idea that, hey, the reason they invoked about the time shaving or whatever did not actually motivate the employer's actions? Is that where you're going here? That's the third articulated reason that I will address whenever the Court wants me to address that, Your Honor. Okay, I'm just trying to understand where this is coming from. I think there's a mismatch. He's asking under those three reasons, you're going through the three separate incidents. Going through each of them. So we're trying to put them in which bucket? Right, I'm just trying to track which. Okay, and I'll do that as I go through it. Okay, and can I ask you one question related to that? Sure. Which is those three incidents, are you saying we should evaluate them individually or collectively? Well, if the Court looks at the District Court's resolution of this, which is at page ID numbers 1412 through 1417, the District Court addresses them pretty much collectively. And how are you, no, I know how the District, I'm sorry, I'm asking how are you asking us? I think each of these were originally articulated as reasons leading to the termination. So But aren't these your three acts of retaliation you're claiming? They are separate acts of retaliation. But you're claiming they're each separate? Yes, each of them are separate acts of retaliation considered ultimately collectively by the District Court in dismissing the state. Okay, so now I'll go back to the first one. I'm sorry, now I got the back. Well, I apologize for misunderstanding where Judge Ketelich wanted to go on that. That's okay. So as to the first written warning, which was April 17, it followed by a single day. I don't want to be difficult, but I mean, let's talk about pretext and let us know which one we're discussing. Are we going to talk about the basis in fact right now? Because you're going through the pretext, which is fine, but I just want to know where these facts apply. Okay, so as to the April 17 written warning, the warning was for, we're not saying the basis of the warning was, I'm sorry, the object of the warning was false. In other words, she did send the email for which she was fired for that. She gets fired, they say, for shaving time from two employees, right? In the District Court, they said all three of those reasons led to the termination, so they were all considered in the termination decision itself. Well, in the District Court, that's not what the company said. Let's assume that for a moment, I mean, the reason she gets fired is the time shaving thing after Williams' investigation. All right, let's say you have to show pretext as to that. I'm suggesting to you, frankly, you do, and that you have to create a genuine issue about that stated reason. When you point to the April 17 written warning, are you, which of the three, to pick up again with Judge Mathis said, which of the three bases for showing pretext? No basis in fact, hey, I didn't, you know. We're saying it's insufficient to support the, as to the April 17 warning, it's insufficient to support. I'm not talking about the April 17 warning, because that's not what, that's not the reason she gets, unless I'm misunderstanding. Is that about the time shaving? I think he's talking about retaliation. Right, I'm talking about the retaliation, but I will address the time shaving. I'll jump ahead to that, Your Honor. That's why they say they fired her. In their brief, they are now saying that was the sole reason. At the court below, they said there were three reasons. The initial written warning, the final warning, and then the time shaving thing. Now, now what they're alleging, and I'll jump to that, Judge Kethledge. Yeah. Now what they're alleging as the only reason for the termination was the alleged wage theft or stealing of wages from two employees, Ms. Bargainer and Mr. Restle. The pretext argument we're making there is, first of all, it's false. She didn't steal wages from anyone. She didn't intentionally deprive either of those employees of wages. It does have a basis in fact, right? You're not saying that mistake wasn't made. We're saying it didn't in fact motivate it. The evidence that the district court didn't consider at all in its pretext analysis were several things, and I'll run through those now. First of all, proximity to a prior complaint. The evidence in the case that was submitted to the district court included the testimony of Ms. Neumoff that on October 8, she called Carlos Del Pozo, who is an operations director for the company, and reiterated for now the fifth time her complaints of discrimination against Almir Vologic, the person imposing these disciplines on her. Okay, so that goes, it seems to me temporal proximity is one of your arguments. Correct. And you don't have a case, right, and you agree, temporal proximity alone isn't enough. Usually it isn't. There are actually a few cases that we saw in your case for you. We have more than that. Okay, and then the second thing is, at least I found it kind of ironic that you're saying temporal proximity, yet Vologic is saying don't fire her. Right? The guy you're saying is discriminating is saying don't fire her at the same time the company is firing her. No, Vologic is saying fire her. Not now. He's saying don't fire her now. Right? You mean in the e-mail exchanges? Yeah. He's saying don't fire her now because I've got to get a replacement. Right. The decision to fire her, though, was a fait accompli on October 16, just eight days after she makes this lengthy phone call complaint to Del Pozo about the ongoing discrimination by Vologic. How do you, well, he is the one responsible for that. It's a fait accompli on October 16. So, if the court looks at the What happened on that day? Remind me. On October 16, in the e-mail exchange in the investigative file, which let me Is that where Del Pozo says he wants to go ahead and terminate her? Right. So, let me find the page for you. So the investigative file begins at page ID number 989. Yeah, it's when Williams finishes her investigation, right? Correct. And if the court looks at 994 and 995, you'll see this lengthy e-mail. That's what we like, is page ID numbers without a fight. Right. That's true. That's why I'm giving it to you, Judge. Okay, keep going. So, on those two pages, you'll see a lengthy e-mail from Ms. Williams recommending the termination relating to this. She doesn't use, by the way, the term wage theft or stealing wages. She uses the term manipulation. And then on page 995, she recommends termination. And on October 16, Carlos Del Pozo, the person who received the complaint by phone call on October 8, then says, it looks like you have the green light. You have my support. That happens on October... Here's what she says. You know that I am thorough and I look at things from all angles, so I will always err on the side of caution and investigate further if necessary. So I'm not finished with my investigation. If I have evidence of clear time manipulation, Patra will have to be terminated immediately. This is not final yet, just a possibility, so please don't mention it to her as I am still investigating. Well, it actually doesn't make a difference in terms of proximity, whether it's on the 16th or the 24th, because it's still within a couple of weeks that in Wyatt, this court recognized as temporal proximity that's sufficient to at least provide circumstantial evidence of retaliation. Why doesn't all this, these e-mails hurt you? Because it suggests they've fired her for exactly the reason they're saying, about the manipulation or whatever you want to call it. Not wage theft. Not wage theft. And our position is, given... You know what they're talking about here, this manipulation? They're talking about changing time cards. Yeah, that's the same thing. As wage theft, as stealing, I don't see how you can equate. So let me run through if I could. This is semantics. I mean, they thought that your client went in and manipulated the time records for these two different employees to reduce the amount of time it appeared that they worked. And then, in order to her benefit. And that's the reason why. Call it what you will. But don't these e-mails support the proposition that that indeed is the reason why they terminated her? It supports... Rightly or wrongly? ...what we think is a contrived reason for this, for this specific reason. This was the culmination of a series of retaliatory disciplines, and I started talking about the first one, that only occurred after she first complained on April 4, and then again on April 16, then again on May 28. These are all in the record. I get that. But, this investigation starts not as a daisy chain from anything this guy, this, I can't say his name, the boss, anything that he does. It's because these two employees come forward and say, hey, you know, I worked more than this, and what's going on? That's a bolt from the sky. Intervening causation, kind of, isn't it? But, no, because you're adding a lot. They simply say my paycheck is incorrect, and who is the person who corrects it? But that's because he worked more than that. It's the same thing. I agree with that, Judge Stepar, but it's not the same as wage theft, because when that was brought to our client's attention, she is the one who then corrected it, made the, what Del Pozo himself said, admitted, took the right steps to correct that wage, incorrect, the original incorrect wage pay on her paycheck. Well, it's after they come to her, and as to one of these employees, they want to see the punch record and the binder. She says she doesn't have it. Now, that record, apparently, was supposed to have been initialed by your client and the affected employee, right? And she did that in a written? Right, but just, I mean, there's the computer recording of the change that a manager might make, and then there's this sort of hard copy binder thing that the manager and the employee are supposed to initial. That's correct. And as to one of these, I think it was William, says, let me see that hard copy, you know, that would be initialed, and your client initially said she didn't have it anymore. It was lost or something. It was gone. No, Your Honor. What happened was she asked for the payroll adjustment form that they're typically, that all managers do, and this is a fairly routine act, so this manipulation of time is the payroll adjustment that they're talking about. That payroll adjustment form, Patronumov testified, and this is undisputed, was requested by her. She didn't have it, so she did just a handwritten where Patronumov signs it and the employee signs it as having resolved the pay issue. She then later put the, when she got the payroll adjustment form, she then later on, I think, the 13th, submitted the payroll adjustment form that is typical of store managers doing those kind of payroll adjustments. Okay. Your time, we've got a red light on, so any questions? Okay, this has been helpful. You'll have your rebuttal, but let's hear what the other side has to say. Good morning, Your Honors, and may it please the Court. My name is Lindsay Woods. I'm here representing Checkers Drive-In Restaurants, Inc., the appellee in this case. I wanted to start by addressing some of the arguments that the panel was asking about when my colleague was up here just now. Temporal proximity is not enough under the undisputed case law of this Court. See Mickey V. Ziedler, McNett V. Harden, Elmer B. Vallemine University. It's not enough, in some cases, even to show pretext or to even establish a prima facie case, nor is it enough on its own to show pretext. Okay, well, you know, anyway. Okay, what else? I mean, isn't there an argument that there's more based on, we have the time issues, but then we have the other allegedly retaliatory conduct back from the vacation days and then the email sort of exchange where there are complaints there. So wouldn't that go towards there being more? Yes, Your Honor. And I do want to address to the argument that Checkers has somehow shifted its reason for termination and that it encompasses all of those things. And I'm going to quote... Does it encompass all or does it just encompass? Our understanding is that the retaliation claims do involve these adverse employment actions of the write-ups, but there was not a culmination effect on the reason for the termination. And I'll read from... The reason for the termination alone is the wage theft. Is the wage theft, yes. They mentioned prior write-ups, but it is the but-for cause. Without the wage theft, there would not have been a termination. Why don't we call it the time card issue, just to make it neutral? The time card issue... So that we're not fighting about semantics on it. So just the time card issue. And agreed, Your Honor. It is semantics, and so the time card issue works for Checkers. In Checkers, the very first line in its memorandum in support of its motion for summary judgment, Checkers terminated plaintiff Patra Newmoth, a female, as general manager of Checkers-owned Rowley's restaurant in Springfield, Ohio, because Checkers discovered that Newmoth had intentionally manipulated employee time cards. It says the same thing in its reply in support of its motion for summary judgment. Can I ask you then about the first retaliatory, alleged retaliatory? So she sends an email, and my understanding is then you discipline her for insubordination under Yazdian, or however you pronounce that case, Yazdian. Why isn't that direct evidence of retaliation? Yes, Your Honor. If you look at the record in front of the court in this case, there's actually not a complaint of discrimination. And direct evidence is evidence that doesn't require any inferences. Here, the direct evidence that... What was Checkers saying that they were investigating? I believe it was Ms. Williams who said she was investigating the complaint, the gender discrimination, and that's why she was asking Ms. Newmoth for information. So if you look at the email itself, it does not have any claims of gender discrimination. She vaguely makes reference to filing a complaint. That could be filing a complaint against Elmir Vlajic because he was discourteous to her. It doesn't specifically state anything related to gender discrimination. But even if it did, she was clearly disciplined for the discourteous email and the phone call. A direct evidence would be she was disciplined because she made a complaint. And direct evidence requires no inferences, and that would be the first inference on this part. The second inference would be that she was, in fact, making a claim of gender discrimination. And to start from the top, I do want to point out that Plaintiff presents no corroborating evidence to meet her burdens here. So we are talking a lot about pretext because that's what the briefs talked about. But because this is de novo review of summary judgment, we can also revisit the Prima Fascia case. Let's just focus in the little time we have on the heart of the matter, which is that Mr. O'Hara thinks that there's a genuine issue as to whether the stated reason, which we're saying is the time card reason, that's what you're saying, that the stated reason was insufficient to motivate her termination. So why don't they have a genuine issue of fact on that ground? Because I would challenge that assertation as purely speculative. There's no evidence in the record to support it. There's no evidence in the record that creates that genuine issue of fact. What about, you know, Blagic being kind of just nasty to her over a period of time? A jury could think that's true. A jury could think that's true, but your boss being nasty to you does not necessarily equate to gender discrimination. And that goes back to the Prima Fascia case, or the Prima Fascia case as well, in the issue of causation. Someone can be mean to you, but not because of your gender. And that is what is lacking in this case, is that evidence that supports, you know, what is being alleged as a contrived reason. Patrick Neumoff's testimony that checkers didn't truly believe this to be the case is not enough to create a genuine issue of fact, a genuine and material issue of fact to preclude summary judgment. Here's a discreet question. This is the kind of thing counsel can help with at argument. In your view, who or what group of people was or were the decision maker with regard to her termination? With regard to her termination, and specifically to the time card issue. Yeah, well that's why she wasn't, there are no other terminations in your view, right? Exactly. So in regards to the time issue, it was April Williams. And your honors made a good point. It looks like she makes a recommendation. So can you explain why you think she's the, I mean it looks like Del Pozo maybe, I don't know. You tell me why she's, whose decision really counts here and why? Ms. Williams' decision really counts here because she is the one that did the investigating. She is the one that ultimately concludes that there needs to be a termination, not only because there was wages taken from employees, but because it exposed the company to liability. And there's no question that she's relying on a set of particularized facts from her own investigation. So what do we do with the fact that Del Pozo sometime in October says to Valagic, you know, we need to, you need to terminate her and you need to do it now. Del Pozo is in fact expanding upon something that Ms. Williams said earlier in an email that this termination needs to happen immediately to avoid any further potential liability to the company for these acts of misnomer. But you're saying he's not responsible for the termination, meaning Del Pozo? I'm saying Del Pozo was involved in the decision making, but he wasn't the decision maker. What is the difference if you're, I mean. The difference here for purposes of this. Who had the authority? Excuse me? Who had the authority? April Williams had the authority to make the termination. Where would I look in the record to support that proposition? In her emails. I don't know that it's written authority, you know, somewhere in the handbook, but she is the one that does the investigation. She is the one that recommends termination. Is that something I have to sort of infer or is there like somebody's deposition she says that? That would be a natural thing in a debt. Is it in a debt somewhere? There's nothing in the deposition that says there's one person solely responsible for making this decision. Do you disagree that Del Pozo had the authority to terminate her? I think Del Pozo also had the authority to terminate her. So I think you have to understand. Anybody else? You know? Let's get it complete. I'm serious. It's, well it's, so to understand the corporate structure at Checkers, right, there's the HR corporate side and then there's the on the ground managers. So Del Pozo is over Velagic, who's over Newmoff, and then April Williams is sort of on this other side with Mr. Bode. And they collaborate on these issues that sort of cross HR and the operations management, you know, this side is sort of generally operations. And so like in most... Do those two agree? Is that it? Those two agree. Nope. April Williams recommends it. They're speaking for their branches and they agree, then that's it. Yes, Your Honor. Like in most cases, somebody has to start the discussion. April Williams starts the discussion, recommends, and nobody objects. They're in Florida, right? These two more senior folks we're talking about? Yes, Your Honor. They're out of Florida. And I would challenge this court to find, actually let me back up for a minute on the insufficiency argument. I want to read from Patrin Newmoff's deposition testimony where she's talking about... She sometimes has to terminate employees as in her role at Checkers. And the questioning attorney asks, and what would be the reason for terminating someone? Asking her why she would terminate someone. The first thing she says is theft. One of the last things she says is insubordination. So not only are theft and insubordination sufficient according to Checkers, they're sufficient according to Patrin Newmoff, not just for disciplinary action, but for actual termination. I did want to direct the court's attention on the intervening cause issue under the actual reason analysis to Green v. Central Ohio Transgender Authority. I think that that case is directly on point here. Did you write that in your brief? We do, yes. And it's 647 Federal Appendix 555, decided in 2016 by this court. In that case, there was summary judgment for the employer at the district court level, then affirmed by this court, and there was a temporal proximity. There was also an honest belief issue, but the bulk of the decision addresses the temporal proximity issue and the issue that your honors alluded to earlier of the intervening cause. In that case, the plaintiff had made several EEOC charges against her current employer while continuing to work there. About three months after the second charge, her employer did an investigation and found that she had been manipulating time, in fact her own time, to say that she was there when she wasn't there. She was stealing from the company in that way. And this court said, nevertheless, an intervening legitimate reason to take an adverse employment action will dispel an inference of retaliation based on temporal proximity. And I read again in a later paragraph, there is no indication that the ultimate decision to terminate the plaintiff was not based on a reasonable and honest belief that she falsified her time cards, particularly in light of the fact that the person who investigated the violations and four of the members of management who agreed with the termination decision are not alleged to harbor any retaliatory animus toward Greene. Finally, the undisputed evidence indicates that the employer had no tolerance for extensive time theft and the plaintiff fails to point to any evidence, such as similarly situated employees with analogous violations who were not terminated, that such a violation was insufficient to motivate her termination. Alright, we'll look that case up. Do you have any more questions? No? Okay, I think we're all set. Thank you, your honors. I probably respectfully ask the court to affirm the district court's grant of summary judgment to appellee checkers. Thank you. Very well. Thank you. We'll hear rebuttal. Thank you, your honor. Just quickly, Yazdian is, as a matter of fact, Judge Tapar, we think directly in point. In that case, the supervisor issued a discipline against an employee specifically for the protected activity she engaged in. I have one question because it seems to me every time they ask for evidence, she's right that that email doesn't talk about discrimination per se, but every time she did say there was discrimination, they asked for evidence of it, is my understanding. Did she ever provide evidence of discrimination other than that he treated her poorly? The evidence she provided, she said that the employees in her store could confirm her treatment by logic. No, I agree with that, that he mistreated her. Right. But as your friend on the other side says, that's different than discrimination. Did she ever provide evidence of discrimination? She provided her own testimony as to what she observed in manager meetings where the male managers were treated very friendly. She was excluded from discussions. That's in her brief that she specifically cites. And she provided that to the company? When they were asking for evidence? She made that statement to the company, yes. As part of her reason. Where is that in the record? And it may also be what would be in her, it's cited in her brief, your honor. Okay. I can say, I can say that, that she, her frustration was the fact that they had access to the employees who could confirm his treatment. And Williams herself agreed that Mr. Blodgett is often rude over a long period of time, yet he was never disciplined. So there's a... Rude is different than, you know, he's mis, he's discriminating based on gender. It's, it's great, but, you know. Well, whether, first of all, the judge found that we made a prima facie case on that. I don't doubt it. And that wasn't an issue on appeal. But let me, if I can, because I only have a little time left, I'd like to go through, remind the court to look at Kirilenko-Eisen case. Okay. Which, which is a case where the court says you have to be suspicious, where in our case, the client worked there five years without disciplinary action taken against her. And then suddenly, she complains on April 4th. She gets her first discipline on April 17th after re-complaining about discrimination. She complains three or four times after that. And then on, on October 16 or 24, whichever date you want to take, she's terminated within a week or two after her last act of complaining specifically about gender discrimination that's undisputed. The proximity issue has to be considered under, well, a welfare case law, including Wyatt, which says adverse actions taken within a week to days after the projected activity is evidence of retaliation. The direct evidence is apparent. That was not considered by the district court. And then finally. What's that? Real quick. The direct evidence is her being disciplined specifically for writing her second email on April 6th. The all caps thing? Right. The all caps. You seemed a little sensitive. Yes. Eggshell on that.  And then as to the termination itself, Del Pozo, Trekker's own official, stated that when he was looking at the corrections, the payroll adjustments or manipulations, whatever you want to call it, time card issues, that she took the right steps. That's his testimony. That's in her brief. Williams conceded in her deposition that the time card adjustments that we're talking about here, and this is at page ID 682, conceded in response to a cross-examination question that yes, it could have been that Plaintiff was trying to correct an error. So not, and Del Pozo testified that no one in this decision making process that led to her termination, no one looked at her records, no one asked anyone regarding intent in these time card mistakes. No one asked the employees affected, if there was any evidence of that intent. Nothing. It was just, there were a series of complaints, and then suddenly she's terminated when she doesn't stop complaining. That's what it comes down to. Take 30 seconds, and you've been off the clock for a while, why don't you take 30 seconds and just give us your summation. Okay, so I can sum it up very succinctly by asking the court to look at Singfeld versus Akron Metro Housing Authority, 387 F. 3rd at 565, where the court says that pretext presents, quote, elusive factual questions, incapable of resolution and summary judgment. Not always. I agree not always. Pardon me? Nothing.  Okay. But not always, I agree. There has to be some evidence. But I've just. You have to be able to find a certain thing. Right. But I've run through the evidence. Yeah, no, that's very helpful. And so I think what I'm asking this court to do, what the district court didn't do, and that is simply do your pretext analysis by looking at the evidence we presented, the testimony of Del Pozo on each of these retaliatory issues, the three that are involved in this case, and none of that evidence was considered, mentioned by the district court at page ID 1412 through 1417 in doing a pretext analysis. We're asking the court to do the correct analysis and reverse and remand for trial. Okay, that's helpful. We will do that and we'll give it careful consideration. I appreciate you. Thank you both for your arguments. The case will be submitted.